# In the United States Court of Federal Claims

No. 14-210C

(Filed Under Seal:  May 29, 2014)
(Reissued:  June 4, 2014)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **BUSINESS INTEGRA, INC.,** ) | Post-award bid protest; best-value |
| ) | negotiated procurement conducted under |
| ) | FAR Part 15; discretion to seek |
| **Plaintiff,** ) | clarification of pricing omissions in |
| ) | offers; FAR § 15.306(a) |
| **v.** ) | |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Joseph Gilbert Billings, Miles & Stockbridge, P.C., Baltimore, Maryland.  Of counsel was Katherine B. Hill, Miles & Stockbridge, P.C., Baltimore, Maryland.

J. Bryan Warnock, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Stuart F. Delery, Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, and Kirk T. Manhardt, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was Charles K. Bucknor, Jr., Assistant General Counsel for Procurement Operations, Department of Homeland Security, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Judge.

This post-award bid protest concerns a procurement by the Department of Homeland Security ("DHS" or "the government") of information technology ("IT") services.  In issuing the pertinent solicitation, DHS sought proposals by offerors responding in one of two different tracks, small business and unrestricted.  DHS anticipated making multiple awards of indefinite delivery/indefinite quantity ("ID/IQ") contracts for each track.  The procurement was subject to the Federal Acquisition Regulations ("FAR"), 48 C.F.R. Part 15.  This case focuses on the small

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and provide proposed redactions of any confidential or proprietary information.  No redactions were requested.

business track.  Business Integra submitted a timely offer under that track but was not awarded a contract because it had omitted some pricing information.  It filed a protest with the Government Accountability Office ("GAO") and, after GAO denied its protest, brought suit in this court.  Now pending before the court is Business Integra's Motion for Judgment on the Administrative Record ("Pl.'s Mot."), ECF No. 18, as well as the government's Cross-Motion for Judgment on the Administrative Record ("Def.'s Cross-Mot."), ECF No. 19.  Business Integra contends that its omission of certain pricing information was *de minimis* and should have been waived or corrected by the government.  The government contends that rejection of Business Integra's proposal was within DHS's discretion because the missing pricing information was material to evaluation of Business Integra's offer.

<h2 style="text-align:center">FACTS[2]</h2>

<h3 style="text-align:center">A.  The Solicitation</h3>

On November 1, 2010, DHS, acting through the Information Technology Acquisition Center within its Office of Procurement Operations, issued request for proposal no. HSHQDC-11-R-10001 for the "Enterprise Acquisition Gateway for Leading Edge Solutions II (EAGLE II) program."  AR 1-6.[3]  The EAGLE II solicitation sought IT solutions for a full range of the agency's needs over a five-year base period with a two-year option period, as an enhancement of the original EAGLE program.  AR 1-13, -21.  DHS anticipated awarding multiple ID/IQ contracts, where awardees would bid on future task orders to provide services.  *See* AR 1-13, -38.  Besides the two tracks, DHS specified three functional categories of particular services sought: Service Delivery (FC1), Program Support (FC2), and Verification and Validation (FC3).  AR 1-1.[4]  Of particular interest is Functional Category 1, which sought "a full range of services

---

[2]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement filed pursuant to RCFC 52.1(a), *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"), and the parties' evidentiary submissions related to prejudice and equitable relief, *see Holloway & Co. v. United States*, 87 Fed. Cl. 381, 391 n.12 (2009) ("It is the responsibility of th[e] [c]ourt, not the administrative agency [conducting the procurement], to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive [or declaratory] relief.") (alterations in original) (quoting *PGBA, LLC v. United States*, 60 Fed. Cl. 567, 568 n.1 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004)).

[3]Citations to the administrative record refer to the record filed on March 26, 2014, and supplemented on March 28, 2014 and April 1, 2014. That record is paginated sequentially and also divided into tabs. In citing to the administrative record, the court will first designate the tab, followed by page number, *e.g.*, AR 1-6 refers to page 6, which is located in tab 1 of the record.

[4]Although DHS did not provide a pre-determined maximum for the number of contracts it would award, it did state that EAGLE II was to be limited to a "manageable" number of

2

and products in support of developing, implementing, and maintaining technology to support the DHS mission and business functions across the entire lifecycle of a program." AR 1-22.  For proposals in FC1, the small business track was divided into four groups, "8(a)," "HUB Zone," "SDVOSB," and "All SB," depending on the classification of the business.  AR 1-1.  The 8(a) group was designated for businesses certified as 8(a) by the Small Business Administration or falling within specified codes of the North American Industry Classification System.  AR 1-104.  Proposals under the FC1, 8(a) group were evaluated against other offerors within that track and group, separately and distinctly from the other groups within the small business track.  AR 1-116 to -17.

The solicitation explained that the government would award contracts to proposals representing the best value, *i.e.*, those which, in the government's estimation, will "provide[] the greatest overall benefit in response to the requirement."  AR 1-116 (quoting the definition of "best value" found in FAR § 2.101).  Each proposal would be evaluated on six factors, five of which were non-price factors.  AR 1-117 to -18.  In descending order of importance, the factors were corporate experience, past performance, program management, staffing, small business participation approach (unrestricted track only), and price.  *Id.*  Combined, the non-price factors were "significantly more important than price."  AR 1-118.  DHS stated that price proposals would be evaluated for accuracy, completeness, and reasonableness, but not assigned a rating.  AR 1-119.

DHS required that offerors provide rates for all 36 labor categories for the base and option years.  *See* AR 1-120, -128 to -33.  DHS emphasized that failure to provide complete pricing information would render a proposal ineligible for an award:

> **Note:** *Failure to offer ceiling rates for all labor categories and all contract periods will result in offer ineligibility.  This means that the omission of a rate for just a single category will result in a material non-conformity in the proposed functional category.*

AR 1-120 (all emphasis in original).  Elsewhere in the solicitation, in the section providing instructions to offerors for cost and price proposal information, the agency mandated that:

> [e]ach [o]fferor shall provide a completed Attachment L-1, *Pricing Templates*, including all of the information described below.  The [o]fferor shall propose fully burdened ceiling labor rates for **ALL** labor categories inclusive of all contract periods.  The fully-burdened labor rates include all direct labor and indirect costs applicable to that direct labor . . . and profit.

AR 1-112 (emphasis in original).  This instruction was repeated in an amendment issued on January 18, 2011, in response to vendors' questions.  *See* AR 4-244, -250.  There, the agency

---

awards.  AR 1-5.  It noted that the original EAGLE program was manageable at the size of 25 awards for the unrestricted track and 28 awards for the small business track.  *Id.*

confirmed that "all offerors should bid all labor categories" and that "offerors that do not bid all categories will not be in compliance with the [solicitation]." AR 4-250, ref. no. 118.

To encourage uniformity in proposals, the agency provided spreadsheets for offerors to use in submitting labor rates with their bids. AR 1-112 to -13. The agency supplied separate spreadsheets to be completed based on where the work would be performed, namely, government sites or contractor sites. AR 1-113. For each spreadsheet, rows represented labor categories and columns represented years of the contract. *See* AR 2-173 to -82. DHS included "evaluation hours," *i.e.*, estimated annual hours, for each labor category. *Id.* Each year ("YR1," "YR2," etc.) had a column for the labor rates per hour ("Pricing") and a column for total cost ("Total Value"). A default value of $0.00 was set for cells under the "Total Value" column for each year, and the pricing columns were blank. *See id.*; *see also* Def.'s Cross-Mot. at 6. When offerors placed their labor rates in the "Pricing" columns, the "Total Value" columns would automatically calculate the total price based on the provided hours. *See* Def.'s Cross-Mot. at 6. If no "Pricing" value was specified, the "Total Value" for that year would remain $0.00. *See* Pl.'s Resp. to Def.'s [Cross-]Mot. for Judgment upon the Administrative Record ("Pl.'s Resp.") at 2.

## B. Business Integra's Proposal

In response to the EAGLE II solicitation, Business Integra timely filed a proposal under the FC1, 8(a) group of the small business track. AR 7-777. In its proposal, Business Integra took no exceptions or deviations from the solicitation, AR 7-770, and stated that it "proposes . . . labor rates for all government-required labor categories and for all contract periods," AR 7-771. Business Integra elaborated on its labor rates by noting that they increased "at about 2.0% per year over the life of the contract," and it included a chart to illustrate this rate of increase in labor rates. AR 7-774. On the labor-rate spreadsheets provided by DHS, Business Integra listed its pricing for the various positions, as required by DHS. *See* AR 7-781 to -81.10. Although Business Integra stated that it had completed rates for all labor categories and all contract periods, it failed to fill in rates for the Level I Applications Systems Analyst, Secret or below, Government Site position ("Level I Systems Analyst") for Year 5, Option Period Year 1, and Option Period Year 2. AR 7-781; *see also* Def.'s Mot. at 6-7; Pl.'s Resp. at 3.[5]

Business Integra apparently intended to provide rates for these years but inadvertently omitted the relevant information. Pl.'s Resp. at 4-5. The company filled out each spreadsheet by providing a dollar value in each row for the first year's labor rate, under the column "YR 1 Pricing," and used the formula it created and imposed on the spreadsheet to calculate the rates for subsequent years. Pl.'s Resp. at 3. The formula in the spreadsheet for Level I System Analyst in Year 5 Pricing was accidently deleted. *Id.* at 4. The resulting blank for Year 5 meant that the years following Year 5, *i.e.*, Option Year 1 and Option Year 2, reflected $0.00 for both

---

[5]Business Integra left a blank for "Year 5 pricing" resulting in a value of "$0.00" for Year 5 Total Value for the particular Level I Systems Analyst position. AR 7-181. For Option Years 1 and 2, the Pricing and Total Value cells both showed "$0.00" for that position. *Id.*

the Pricing and Total Value columns because the rates for those years depended on the previous year's rate per Business Integra's formula. *Id*. at 5; *see also* AR 7-781.[6]

### C.  DHS's Action

Due to the missing information regarding pricing, Business Integra was eliminated from consideration for an award.  During a debriefing, DHS explained its evaluation of Business Integra's proposal. *See* AR 13-890 to -95 (DHS's debriefing with Business Integra (Nov. 22, 2013)).[7]  The government rated Business Integra highly for all of the non-price factors.  AR 13-891 ("[Business Integra's] proposal clearly demonstrated the capability to deliver exceptional performance related to the services.").  While the price factor was "determined to be reasonable and realistic . . . , "it was inaccurate and [in]complete."  AR 13-893.  Business Integra "left three labor rates blank under the [Level I Systems Analyst]." *Id*.[8]  DHS found that "this omission results in material non-conformity with the requirements of the [solicitation]" and resulted in the "pricing proposal [being] deemed non-compliant with the instructions of the solicitation and therefore ineligible for award." *Id.*  DHS had received 160 proposals in the FC1, 8(a) group, and awarded 15 contracts from that array. *See* AR 11-853, 16-890.

### D.  Protests

On November 26, 2010, Business Integra filed a protest with GAO.  Pl.'s Mot. at 1.  After GAO denied the protest, *see Business Integra, Inc.*, B-407273.22, 2014 CPD ¶ 88, 2014 WL 930281 (Comp. Gen. Feb. 27, 2014), the company filed a complaint in this court, along with a motion for a preliminary injunction. *Id.*  Proceedings on the merits were accelerated, and in accord with RCFC 65(a)(2), consideration of the motion for a preliminary injunction was consolidated with the hearing on the cross-motions for judgment on the administrative record.

### JURISDICTION

The court's jurisdiction over bid protests is derived from the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3784 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b)).  The Tucker Act permits "an interested party [to] object[] to a solicitation by a [f]ederal agency for bids or proposals for a

---

[6]Business Integra avers that the pricing should have reflected labor rates of $52.22 for Year 5, $53.26 for Option Year 1, and $54.33 for Option Year 2.  Pl.'s Resp. at 4.  This would have resulted in Total Values of $5,482.74 for Year 5, $5,592.39 for Option Year 1, and $5,704.24 for Option Year 2, for a total of $16,779.37 for all three missing years. *Id.*

[7]In the paper copy of the administrative record, tab 13 is mistakenly labeled as tab 63.  The court will refer to this tab as tab 13.

[8]Although DHS refers to "three labor rates [left] blank," there was only one actual "blank," but that one "blank" led to pricing values and total values of "$0.00" where Business Integra had intended other values.

proposed contract or to a proposed award or the award of a contract" by bringing suit in this court.  28 U.S.C. § 1491(b)(1).  An "interested party" is an actual or prospective bidder who possesses a direct economic interest affected by the award or failure to award the contract.  *Rex Service Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  A showing that the bidder had a substantial chance of winning the contract is generally sufficient to establish a direct economic interest.  *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (citing *Rex Serv.*, 448 F.3d at 1308).  More specifically, "'a bidder has standing to challenge the lawfulness of discretionary acts that operate to exclude the bidder from consideration in cases where the bidder's ratings are such that had the government acted lawfully the bidder would have had a substantial chance of winning the contract.'"  *ST Net, Inc. v. United States*, 112 Fed. Cl. 99, 107 (2013) (quoting *G4S Tech. GW LLC v. United States*, 109 Fed. Cl. 708, 719 (2013)).  The parties agree that Business Integra is an "interested party" because it was an offeror whose direct economic interest was adversely affected by the government's decision to eliminate it from consideration for an award of a contract.  *See BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 508 (2013).

## STANDARDS FOR DECISION

The court's proceedings in a bid protest are governed by the standards set forth in Section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  Under the specified standard, a reviewing court may set aside an agency's decision if the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  To reach such a finding and set aside an award, the court must conclude that the agency's "decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure."  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *Impresa Construzioni*, 238 F.3d at 1332).  The court cannot "substitute its [own] judgment for that of the agency . . . and it must uphold an agency's decision against a challenge if the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *BCPeabody*, 112 Fed. Cl. at 508 (internal quotation marks omitted) (citing *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004), and *Axiom Res. Mgmt., Inc. v. United States*, 564, F.3d 1374, 1381 (Fed. Cir. 2009)).

## ANALYSIS

Business Integra's protest centers around the solicitation's provisions regarding labor rates and its own omission and errors regarding three such rates in its proposal.  Pl.'s Mot. at 1.  Specifically, Business Integra argues that the government's determination that the proposal's omissions rendered the entire proposal unacceptable was arbitrary and capricious because (1) the single omission of theYear 5 pricing for a Level I Systems Analyst was *de minimis* and therefore not material, and (2) the government should have recognized the errors and either waived the errors, corrected the errors itself, or allowed Business Integra to correct the errors.  Pl.'s Mot. at 28, 34; Pl.'s Resp. at 7-17.  Thus, the court must consider: (1) whether the solicitation's

provision that proposals include all labor rates is a material term, and (2) what the government's obligations were in addressing the errors.

## A. Materiality

To be acceptable, a proposal in a procurement "must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals." *Centech Grp.*, 554 F.3d at 1037. Correspondingly, "a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) (internal citations and quotations omitted). While the parties agree that the government has the right to reject an offer that has a material defect, they disagree whether the labor-rate provision in the EAGLE II solicitation constituted a material technical requirement or a *de minimis* administrative directive. *See* Hr'g Tr. 22:7-13, 34:22 to 35:15 (Apr. 25, 2014).[9]

Business Integra argues that its errors were *de minimis* because the omitted prices would have amounted to only 0.0041% of the projected Total Value of its proposal. Pl.'s Resp. at 8. In support of this assertion, the company relies on GAO's decision in *W.B. Constr. & Sons, Inc.*, B-405818, 405818.2, 2012 CPD ¶ 17, 2012 WL 32162 (Comp. Gen. Jan. 4, 2012). Pl.'s Resp. at 8-9. In *W.B. Construction*, GAO determined that failure to bid on a line item was a minor informality because the price of that item was *de minimis* compared to the total cost of the contract, amounting to less than 0.07%, and would not have affected the competitive standing of the bidders. *W.B. Constr.*, 2012 WL 32162, at *4. In the circumstances, GAO determined that the federal agency's rejection of the bid as nonresponsive was unreasonable; the agency should have waived the omission as a minor informality. *Id.*, at *3.

Business Integra's reliance on *W.B. Construction* is unavailing because the regulatory regime applicable to that procurement differs significantly from that established for EAGLE II. The solicitation in *W.B. Construction* was a sealed-bid procurement, regulated under FAR Part 14. *W.B. Constr.*, 2012 WL 32162, at *1 n.1, *4. Contrastingly, the EAGLE II solicitation was a procurement by negotiation subject to FAR Part 15. *See* AR 1-116. "[A] fairly sharp divide remains between the clarification rules in Part 15 for negotiated procurements and the mandatory nature of comparable provisions in Part 14 for sealed bidding." *BCPeabody*, 112 Fed. Cl. at 510.[10] Under FAR Part 14, the government is *required* to seek clarification for minor informalities and irregularities, but under FAR Part 15, the government is *permitted* but not

---

[9]Further citations to the transcript of the hearing conducted on April 25, 2014 will omit the date.

[10]Although knowledgeable commentators have criticized the divergent approaches taken by FAR Part 14 and FAR Part 15 in this regard, *see BCPeabody*, 112 Fed. Cl. at 511 n.9 (quoting Ralph C. Nash, 27 No. 9 Nash & Cibinic Rep., *Correcting Mistakes: Negotiation v. Sealed Bidding*, ¶ 41 (Sept. 2013)), the FAR has maintained the different approaches for the two types of procurements.

required to allow offerors to resolve minor or clerical errors. *Id.* at 509-10 (comparing the effect of FAR § 14.407-1 to that of FAR § 15.306(a)(2)).  Specifically, FAR Part 14 provides that

> [a] defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired.  The contracting officer either shall give the bidder an opportunity to cure any deficiency resulting from a minor informality or irregularity in a bid or waive the deficiency, whichever is to the advantage of the [g]overnment.

FAR § 14.405.  The GAO relied on this provision when it determined that the omission in *W.B. Construction* was *de minimis* and that the agency was unreasonable in rejecting the bid.  *See W.B. Constr.*, 2012 WL 32162, at *4.[11]  In contrast, FAR § 15.306 provides that "offerors may be given the opportunity to clarify certain aspects of proposals (*e.g.*, the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors."  FAR § 15.306(a)(2).  Price is not mentioned in Section 15.306, and FAR Part 15 provides no definition for "minor or clerical errors."  *See BCPeabody*, 112 Fed. Cl. at 509.

In this instance, "since the [proposal] at hand was the result of a negotiated procurement process, its administration is governed only by the provisions in [FAR Part] 15."  *C.W. Over & Sons, Inc. v. United States*, 54 Fed. Cl. 514, 521 n.10 (2002) (disapproving of application of FAR Part 14 to a negotiated procurement).  While this court has found an abuse of discretion in bid protests governed by FAR Part 15 where the government failed to inquire into copying errors that affected the procuring authority's evaluation of past performance, *see BCPeabody*, 112 Fed. Cl. at 513, an omission of pricing information has not been found to be a minor or clerical error in these types of procurements, *see ST Net*, 112 Fed. Cl. at 111.

This court's decision in *ST Net* provides a helpful analog to the case at hand.  In *ST Net*, the protester omitted pricing information in its proposal for a negotiated procurement, which, if included, would have increased the total price by about 7%.  112 Fed. Cl. at 110.  The court

---

[11]GAO has subsequently commented that in a procurement subject to FAR Part 14, *W.B. Construction* supports the proposition that —

> [a] defect or variation is immaterial if the effect on price, quantity, quality, or delivery is negligible when contrasted with the total scope of the services being acquired.  Thus, a contracting agency may waive the failure to bid on an item as a minor informality if the item for which the price is omitted is divisible from the solicitation's overall requirements, *de minimis* as to total cost, and would not affect the competitive standing of the bidders.

*Massillon Constr. & Supply, Inc.*, B-407931, 2013 CPD ¶ 85, 2013 WL 1281625, at *3 (Comp. Gen. Mar. 28, 2013) (holding that an omitted price was not divisible from the solicitation's requirement and thus that a bid was nonresponsive).

determined that the error was material, not because of the dollar amount of the error, but because the price information was important to the government's evaluation of the offer. *See ST Net*, 112 Fed. Cl. at 109-10 ("Importantly, the price, brand/model information, and discount rates were not simply estimating tools, but were actually binding on the offerors."). Business Integra attempts to distinguish *ST Net* by arguing that its error, amounting to 0.0041% of its projected Total Value, is far smaller than the pricing error in *ST Net*. Hr'g Tr. 12:21 to 13:7. This argument is at odds with the EAGLE II solicitation, which explicitly states that omission of even a single labor rate, no matter its significance, "will result in a material non-conformity." AR 1-120. Business Integra asserts that this provision, along with other similar provisions in the solicitation, "cannot convert an [otherwise] immaterial requirement into a material one." Pl.'s Mot. at 27.[12]   To support this argument, Business Integra cites a number of cases from this court and from GAO. *See id.* Business Integra focuses on two cases in particular: *Linc Gov't Servs., LLC v. United States*, 108 Fed. Cl. 473 (2012), and *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653 (2010). Pl.'s Resp. at 13. Although these cases addressed negotiated procurements under FAR Part 15, the courts relied exclusively on Part 14 as a legal ground for determining that missing pricing breakdown information was immaterial. *See Linc Gov't Servs.*, 108 Fed. Cl. at 503 (citing FAR § 14.405 in determining a blank in pricing was a *de minimis* error); *DMS All-Star*, 90 Fed. Cl. at 666 n.16 (citing as its only authority *Am. Spare Parts, Inc.*, B- 224745, 87-1 CPD ¶ 4, 1987 WL 101290 (Comp. Gen. Jan. 2, 1987), which involved a Part 14 sealed bidding). Nonetheless, both cases are inapposite here not because they looked to FAR Part 14 but instead because the errors being addressed were in formatting rather than in setting out pricing information. In *Linc Government Services*, the court allowed the government to exercise its discretion to accept blanks in place of zeros in a bid. 108 Fed. Cl. at 503-04 ("[The] oversight did not deprive the [agency] of any information."). Similarly, the government in *DMS All-Star* could allow a proposal that did not format information already in the proposal into a specific section. *DMS All-Star*, 90 Fed. Cl. at 666 n.16 ("[A]ll material information required by the solicitation [was] present."). [13]   Thus, even if *Linc Government Services* and *DMS All-Star* had applied FAR Part 15, the result in those cases would have been the same.

The other cases Business Integra cites are also inapposite. Some are sealed biddings under FAR Part 14 and therefore are not pertinent to the EAGLE II solicitation. *See Tri-*

---

[12]The government argues that Business Integra has waived the right to challenge the fairness of the DHS's evaluation of its offer by not filing its protest before proposals were due. Def.'s Mot. at 11-14 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007)). In the government's view, the solicitation stated that labor rates were material terms and Business Integra's protest directly challenges that aspect of the solicitation. Def.'s Mot. at 13. Although the government is correct that challenges to the solicitation's terms themselves should be brought as a pre-award bid protest, Business Integra is not arguing that the EAGLE II solicitation itself is flawed. Instead, Business Integra is challenging the government's discretion in applying the solicitation's terms. *See* Pl.'s Resp. at 11.

[13]Both decisions found that the government acted reasonably in considering the offers despite the omissions. *See Linc Gov't Servs.*, 108 Fed. Cl. at 504; *DMS All-Star*, 90 Fed. Cl. at 666 & n.16. This conclusion is not the same as determining, as Business Integra claims, that the government would have acted unreasonably if it had disallowed the offers because of the errors.

*Services, Inc.*, B-245698, 92-1 CPD ¶ 75, 1992 WL 15020 (Comp. Gen. Jan. 15, 1992); *Am. Spare Parts*, 1987 WL 101290. Others are distinguishable because the proposals at issue contained omissions unrelated to price or included total price but omitted unit pricing. *See AABCO, Inc. v. United States*, 3 Cl. Ct. 109, 117-19 (1983) (finding that omission of leading zeros in rate information was immaterial when determining the value of the rate); *Challenger Piping, Inc.*, B-221855, 86-1 CPD ¶ 385, 65 Comp. Gen. 505, 1986 WL 60613, at *1-*2 (Apr. 18, 1986) (determining that failure to provide a list of manufacturers and suppliers was not material when compliance was otherwise indicated); *Andrea Radio Corp.*, B-198240, 80-2 CPD ¶ 165, 1980 WL 16036, at *1 (Comp. Gen. Sept. 2, 1980) (finding that pricing per line item was unnecessary when a bid included a total price); *Fisher Berkeley Corp.*, B-196432, B-196432.2, 80-1 CPD ¶ 26, 1980 WL 17309 (Comp. Gen. Jan. 9, 1980) (finding that failure to include a testing certification from a specific laboratory on equipment was immaterial); *Mountain Eng'g & Constr. & Weisz & Sons*, B-194472, 79-2 CPD ¶ 153, 1979 WL 12114, at *2 (Comp. Gen. Aug. 27, 1979) (determining that unit pricing was unnecessary when it could be derived from provided total price and quantity of items); *Space Age Eng'g, Inc.*, B- 176425, 1972 WL 6219, at *3-*4 (Comp. Gen. Oct. 18, 1972) (same).[14] None of the errors in the cited cases resulted in a change in pricing.

In addition, Business Integra fails to account for the fact that the EAGLE II solicitation is for an ID/IQ procurement. The government asserts that the requirement to commit to ceiling rates in all labor categories for all years is important because the solicitation's purpose includes providing a basis for robust competition within a pool of small businesses that are ready and willing to provide all the FC1 IT services DHS requires. This purpose would be frustrated if the labor-rates provision were to be considered immaterial. Def.'s Mot. at 17. Without this requirement, DHS would have been unable properly to select a manageable pool of businesses that would be able to compete for future task orders. Def.'s Mot. at 17; Hr'g Tr. 17:12 to 18:5. In addition, pricing on individual elements of the proposal might become important in selecting awardees to perform particular task orders under the ID/IQ framework. Def.'s Mot. at 17 ("[I]t is safe to say the requirement that contractors commit in advance to ceiling rates for the entire ID/IQ contract in all labor categories is a substantial concession that will have a significant impact on future task order pricing."). The court accepts that the requirement to provide pricing for all labor categories for all years was a material term of the solicitation. While Business Integra's argument regarding the inability of an agency to declare an immaterial term to be a material one is valid in an abstract sense, it has not been supported on an as-applied basis in challenging DHS's exercise of discretion in this particular set of circumstances. Rather, the warning in the EAGLE II solicitation that pricing omissions would be considered a material defect was reasonably applied by DHS's procurement officials.

### B. DHS's Discretion In Addressing Errors

Business Integra's second asserted ground for error is closely related to its first argument. In asserting that DHS abused its discretion, Business Integra contends that the agency should

---

[14]Many of these cases were decided prior to 1984, when FAR Part 15 was first issued, *see BCPeabody*, 112 Fed. Cl. at 509, and therefore do not specify if the solicitations were negotiated procurements or involved sealed bidding.

have recognized the error and waived or corrected it. Pl.'s Resp. at 15-17. Business Integra states that the pattern of its labor-rate increases, stepping upward at 2% per year, was specified in its proposal, and that the government should have corrected the errors by calculating and then inserting the missing rates. Pl.'s Resp. at 15-16. The government resists any suggestion that DHS could have made the calculations necessary to provide the missing information or that it had an obligation to exercise its discretion to take such a step, emphasizing the high number of proposals submitted. Hr'g Tr. 26:5 to 28:15.

In support, Business Integra cites *Military Waste Management, Inc.*, B-228862, 87-2 CPD ¶ 424, 1987 WL 103070 (Comp. Gen. Oct. 30, 1987). *See* Hr'g Tr. 10:11 to 11:16. The GAO determined in *Military Waste* that the contracting officer could, under FAR § 14.406-2(a) (1986), recodified as FAR § 14.407-2, seek an explanation from a bidder regarding an evident clerical error. 1987 WL 103070, at *1. Because the bidder confused a "per housing unit" term with a monthly price, it was "simple mathematics" to correct the problem. *Id.* Business Integra argues that the mathematics required to calculate a 2% increase is simpler than converting per-housing-unit to per-month. Hr'g Tr. 11:12-16. Even if this statement were true, it does not legally require an agency to conduct such calculations. *Military Waste* stated that, under the former provisions of FAR Part 14, an agency acted reasonably when seeking clarification in a sealed bidding procurement; it does not support a correlated reverse proposition – that failing to seek clarification in negotiated procurements is unreasonable. In addition, unlike Business Integra's omission, the mistake in *Military Waste* did not change the final proposed cost. Instead, the government is permitted to reject an offer that is materially incomplete without needing to conduct an investigation into the omission and to calculate the gap-filling information. *Accord ST Net*, 112 Fed. Cl. at 110 (citing *IBM Corp v. United States*, 101 Fed. Cl. 746, 758-59 (2011)).

Alternatively, Business Integra argues that the government should have waived the defect or allowed Business Integra to correct the defect. Pl.'s Resp. at 17-20; Pl.'s Mot. at 34-36. Business Integra relies on FAR § 52.215-1, incorporated into the EAGLE II solicitation, AR 1-100, for the proposition that the government had the authority to waive the defect or allow corrections, *see* Pl.'s Resp. at 11. FAR § 52.215-1 states that "[t]he [g]overnment may waive informalities and minor irregularities in proposals received." 48 C.F.R. § 52.215-1(f)(3). The next paragraph of this subsection of the FAR provides that "[t]he [g]overnment intends to evaluate proposals and award [contracts] without discussions with offerors (except clarifications as described in FAR [§] 15.306(a)." 48 C.F.R. § 52.215-1(f)(4). As noted earlier, the cited provision of the FAR permits clarifications as "limited exchanges" to provide offerors "the opportunity to clarify certain aspects of proposals . . . or to resolve minor or clerical errors." 48 C.F.R. § 15.306(a)(1), (2). Because Business Integra's error was material, the government was under no obligation to waive the error or allow Business Integra to correct the error. *See ST Net*, 112 Fed. Cl. at 110. As the government points out, requiring the agency to waive Business Integra's error could result in disparate treatment among offerors and thus constitute an abuse of discretion. Def.'s Mot. at 19; *see also Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273 (2004) ("[An] agency's failure to follow the terms of its own [s]olicitation and selection of an offeror based upon different requirements than those imposed upon the only other offeror are quintessential examples of conduct which lacks a rational basis."), *modified on other grounds* by *Hunt Bldg. Co. v. United States*, 63 Fed. Cl. 141 (2004).

**CONCLUSION**

For the reasons stated, Business Integra's Motion for Judgment on the Administrative Record is DENIED, and the government's Motion for Judgment on the Administrative Record is GRANTED.  Correspondingly, Business Integra's Motion for a Preliminary Injunction is DENIED.  DHS acted reasonably when it determined that Business Integra's proposal was ineligible for an award.

The Clerk is directed to issue final judgment for the government in accord with this disposition.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge